UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL WOOD,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　-vs-<br><br>NATIONAL PARK SERVICE, DEBRA HAALAND, in her official capacity as Secretary of the United States Department of the Interior, and ALEXCY ROMERO, in his official capacity as Superintendent of the Fire Island National Seashore,<br><br>　　　　　　　　　　　　Defendants. | Case No. 23-6249<br><br>**COMPLAINT FOR DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.　　　Alexcy Romero, in his capacity as the Superintendent of the Fire Island National Seashore, has abused the authority granted to him pursuant to 36 C.F.R. § 7.20, has arbitrarily and capriciously rendered decisions and imposed penalties upon the residents of Fire Island, and has otherwise acted unlawfully in relation to the residents of Fire Island. In doing so, Superintendent Romero has treated the Fire Island National Seashore as his personal fiefdom, over which he is free to impose his will without restraint. Making matters worse, Superintendent Romero has wielded this power in retaliation against those who have exercised their First Amendment rights in disagreement with Superintendent Romero.

2.　　　This Complaint ultimately concerns the illegal suspension of Plaintiff's Essential Service Permit predicted on unadjudicated violation notices. However, the events leading up to this illegal suspension evidence Superintendent Romero's pattern of abusing his authority. In short, Superintendent Romero attempted to terminate the former Chief Ranger for refusing an illegal order. Plaintiff exercised his First Amendment rights to publicly and financially support the former Chief Ranger, after which Plaintiff was issued two violation notices based upon a

1

review of surveillance video, by a Ranger that appears to have been looking specifically for Plaintiff's vehicles. Those violation notices end up being the predicate for a suspension despite not being adjudicated. In denying Plaintiff's appeals of his suspension, Superintendent Romero disregards the circumstances and severity of the alleged violations, and the fact that they were not adjudicated.

## JURISDICTION AND VENUE

3. Plaintiff brings this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551-559, 701-706. The Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331. The Court may issue declaratory judgment pursuant to 5 U.S.C. § 702 and 706.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). A substantial part, if not all, of the events giving rise to Plaintiff's claim occurred in this District.

## PARTIES

5. Plaintiff is a private citizen who is a lifelong year-round resident of Fire Island. Plaintiff is also a business owner who works on Fire Island. Plaintiff has multiple driving permits issued pursuant to 36 C.F.R. § 7.20, including Essential Service Permits and Construction Permits.

6. Defendant National Parks Service ("NPS") is a federal government agency and a bureau of the United States Department of the Interior ("DOI"). NPS is responsible for the management of the Fire Island National Seashore.

7. Defendant Debra Haaland is the Secretary of the United States Department of the Interior. The Secretary is responsible for administering and protecting the Fire Island National Seashore with the primary aim of conserving the natural resources located there.

8.      Defendant Alexcy Romero is the Superintendent of the Fire Island National Seashore. Upon information and belief, Superintendent Romero was appointed to this position in August 2018 by NPS Northeast Regional Director Gay Vietzke.

**FACTUAL BACKGROUND**

9.      The events giving rise to Plaintiff's claim began after Superintendent Romero became the Superintendent of the Fire Island National Seashore. Superintendent Romero, upon information and belief, quickly disregarded the usual and customary practices of the Fire Island National Seashore, instructed Park Rangers under his command to selectively enforce laws and give preferential treatment to specific groups on Fire Island, and punished those who refused his unlawful directives.

10.     One example of Superintendent Romero's abuse of authority concerned the former Chief Ranger, John Stewart. Chief Ranger Stewart was, upon information and belief, forced out of the National Park Services after refusing to comply with an illegal order from Superintendent Romero. Plaintiff was an outspoken supporter of Chief Ranger Stewart, and the top contributor to a fund set up to help Chief Ranger Stewart as he appealed the attempt to terminate him. Soon thereafter, Plaintiff became a target for Superintendent Romero's retaliation.

**A. Plaintiff's Outspoken Support for Former Chief Ranger Stewart.**

11.     Plaintiff, a lifelong resident of Fire Island, has known Chief Ranger Stewart for over two decades. Upon information and belief, Chief Ranger Stewart began working at the Fire Island National Seashore in the late 1990s. During his entire tenure at the Fire Island National Seashore, Chief Ranger Steward had a great working relationship with the year-round residents of Fire Island, including Plaintiff.

12. In the summer of 2019, Superintendent Romero, upon information and belief, began instructing Park Rangers not to enforce New York State public nudity laws that had been adopted by the Fire Island National Seashore pursuant to the Superintendent's Compendium dated February 4, 2013. The directive from Superintendent Romero was, upon information and belief, limited to Fire Island Pines, Carrington Tract and Cherry Grove areas. Upon information and belief, Superintendent Romero had friends who spent time in these areas and he did not want New York's public nudity laws enforced against his friends.

13. Upon information and belief, Chief Ranger Stewart refused to selectively enforce the New York State public nudity law, as directed by Superintendent Romero, because he believed that the directive was an illegal order that provided certain communities of Fire Island with preferential treatment.

14. As a result of Chief Ranger Stewart refusing to abide by Superintendent Romero's illegal directive, Superintendent Romero, upon information and belief, retaliated against Chief Ranger Stewart by attempting to terminate him based upon a questionable finding that Chief Ranger Stewart misused his official vehicle for non-official purposes, and a unilateral determination that Chief Ranger Stewart acted with a lack of candor. As a result of this attempted termination, Chief Ranger Stewart and his family were forced to relocate from their housing in the height of the COVID-19 pandemic.

15. The year-long residents of Fire Island were dismayed when they learned that Chief Ranger Stewart was pushed out by Superintendent Romero, and they sought to help him. The Fire Island Year Round Residents Association, of which Plaintiff is a member, wrote a letter in support of Chief Ranger Stewart, and a fund was established to help Chief Ranger Stewart as he appealed the charges underlying Superintendent Romero's efforts to terminate him. On July

4

13, 2020, Plaintiff contributed $2,121.00 to this fund. Plaintiff was the fund's largest single contributor.

16. Upon information and belief, Superintendent Romero knew about Plaintiff's outspoken support for Chief Ranger Stewart. This ultimately put Plaintiff, and Plaintiff's Essential Services Permits, in Superintendent Romero's cross hairs. As described in further detail below, Plaintiff's vehicles appear to have been deliberately targeted for notices of violations after Plaintiff expressed support for Chief Ranger Stewart, and it was these unadjudicated notices of violations that were eventually used as the predicate to suspend Plaintiff's Essential Services Permit.

**B. Fire Island National Seashore Driving Permits.**

17. Pursuant to 36 C.F.R. § 7.20(a)(4), "[n]o motor vehicle, other than a piece of firefighting apparatus or a motor vehicle owned and operated or leased by a duly constituted law enforcement agency having jurisdiction within the Seashore, shall be operated on Seashore lands without a valid permit issued by the Superintendent."

18. Only select persons are eligible for permits, including: (i) those persons who are year-round residents; (ii) those persons who held part-time permits prior to January 1, 1978; (iii) those persons, firms, partnerships, corporations, organizations, or agencies which provide services essential to public facilities and the occupation of residences on the Island; (iv) those persons who desire access by motor vehicle to Seashore lands in order to engage in fishing or hunting thereon, provided such access is compatible with conservation and preservation of Seashore resources; (v) those owners of estates in real property located on the Island who have a demonstrated need for temporary access to that property on days when there is no alternative

transportation; and (vi) holders of reserved rights of use and occupancy. *See* 36 C.F.R. § 7.20(a)(5)(i)-(vi).

19. The Superintendent is charged with approving or denying applications for permits, and "[p]ermits will be issued only for those motor vehicles whose travel on Seashore lands is deemed by the Superintendent to be essential to the management or enjoyment of Seashore resources, or to the occupancy of residences or the ownership of real property on the Island." 36 C.F.R. § 7.20(a)(6).

20. In making a determination on a permit application, "the Superintendent shall consider the purpose of the Act in providing for the conservation and preservation of the natural resources of the Seashore and for the enjoyment of these resources by the public; the scope and purpose of such travel; the availability of alternative transportation on the day or days when the applicant for a permit requests to travel on Seashore lands; the present or past issuance of permits to the applicant; any limitation on the number of permits established.…" *Id.*

21. The Fire Island driving permits are not valid for more than one year. 36 C.F.R. § 7.20(a)(9)(i) ("No permit issued under these regulations shall be valid for more than one year."). Thus, a permit issued for the year 2020 would not be a valid permit subject to suspension or revocation in the year 2023.

22. The "[f]ailure to comply with the conditions of any permit issued" pursuant to 36 C.F.R § 7.20(a), "will constitute a violation of" the regulation, and "[i]n addition to any penalty required by [36 C.F.R.] § 1.3(a) … for a violation of regulations in this paragraph, the Superintendent may suspend or revoke the permit of a motor vehicle involved in such a violation." 36 C.F.R. § 7.20(a)(12)(ii). Notably, it is only "the permit of a motor vehicle involved in" a violation that is subject to suspension.

6

23. Additionally, Section 1.3(a) provides that "[a] person *convicted* of violating a provision of the regulations contained in parts 1 through 7… shall be subject to the criminal penalties provided under 18 U.S.C. 1865." 36 C.F.R. § 1.3(a) (emphasis added). Thus, the Superintendent's authority to suspend or revoke a permit, which is only "in addition to" the penalties required by Section 1.3(a), only arises after a conviction.

24. Enforcement of violations, however, has historically been inconsistent.

C. **Superintendent Romero's 3-Strike Rule.**

25. By letter dated August 12, 2019, Superintendent Romero addressed the inconsistent enforcement for violations of the permit conditions. Specifically, he explained that "park management has been working hard to identify opportunities for improvement within our administration and enforcement of the off-road vehicle use within the park," and that "one of those opportunities for improvement [is] establishing a consistent consequence for routine permit violations." He further explained that "fines resulting from a permit violation are meant to deter further violations," and that when fines are "no longer effective in ensuring adherence to the conditions of a permit, we must adapt."

26. Superintendent Romero continued, explaining that "[f]or the remainder of the 2019 permit season, we will continue to operate as we have. Law Enforcement Park Rangers will use their judgment to issue the appropriate warning or citation to violators of permit conditions. We will also begin focusing on education regarding our path forward."

27. However, Superintendent Romero stated that "routinely violating the conditions of [a] permit will result in permit revocation in 2020," and that "[a] permit holder may have their permit revoked depending on the severity of the offense and/or after 3 violations of permit conditions within a 3-year span. This will result in that user being placed at the bottom of the

7

waiting list for many years before their permit is reinstated, or having their permit permanently revoked."

28. In a subsequent letter dated April 14, 2021, Superintendent Romero "decided to revise the conditions of the 2020 3-Strike Rule to be more considerate of the impact to the permit holder," and explained that "[t]he new terms of the 3-Strike Rule will be fully implemented in 2021 and introduces the possibility of suspension of driving privileges as well as revocation of the driving permit," and that "[t]he Park will review the history, nature, and severity of the offenses, and issue a decision via memorandum to the permit holder."

29. He also explained the appeal process associated with his new 3-Strike Rule, stating that "[a]ppeals to the action must be made in writing, and can be directed to the Superintendent's Office with proper documentation within 7 days of the date of the decision-making Memorandum."

30. Superintendent Romero further explained that in "the 2020 calendar year, we had permit holders who received 3 citations," and that "[f]ollowing this memorandum, the National Park Service in the coming days will reach out to those permit holders to initiate the appropriate action in 2021."

31. However, enforcement remained inconsistent. Following the implementation of Superintendent Romero's 3-Strike Rule through April 28, 2023, there were a total of three Essential Services Permits suspended or revoked. There were no suspensions or revocation in the years 2019, 2020, or 2021. There was one suspension or revocation in 2022, and two in 2023— one being Plaintiff's Essential Services Permit.

### D. Plaintiff's Essential Services Permit.

32. Plaintiff holds numerous Essential Services Permits and Construction Permits that allow him to drive to and from Fire Island at certain times. Plaintiff has held Essential Services Permits since 2005. Plaintiff uses these permits to transport and remove debris and waste, including commercial and residential trash, construction and demolition debris, and recyclables, from Fire Island to authorized waste management facilities located on the mainland.

33. As indicated by the authorizing regulation, Plaintiff's permits had been determined by a Superintendent to be "*essential* to the management or enjoyment of Seashore resources, or to the occupancy of residences or the ownership of real property on the island." 36 C.F.R. § 7.20(a)(6) (emphasis added).

34. By letter dated January 27, 2023 from Chief Law Enforcement Ranger Erik Westpfahl, Plaintiff was informed that his Essential Services Permit was being suspended based upon three unadjudicated violation notices, the most recent of which was issued in September of 2020 during the height of the COVID-19 pandemic. This was the first Plaintiff heard of his suspension. The National Park Services did not reach out to Plaintiff "in the coming days" after Superintendent Romero's April 14, 2021 letter.

35. The January 27, 2023 suspension letter referenced Superintendent Romero's 3-Strike Rule, and explained that "you have been identified as a permit holder who received three citations under your Essential Service permit." The letter then identified three alleged violations: first, on May 9, 2020, an alleged violation of 36 C.F.R. § 7.20(a)(12)(i) for violating terms of a permit; the second, on September 28, 2020, an alleged violation of 36 C.F.R. § 7.20(a)(4), for failure to have a federal permit; and finally, the third, on September 16, 2020, another alleged violation of 36 C.F.R. § 7.20(a)(12)(i) for violating terms of a permit.

9

36. Chief Ranger Westphfal noted that "[a]fter your 3rd citation, the park was to notify you that a suspension action was forthcoming. However, due to the vacancy of the Chief Ranger position at the time, this process was delayed until recently."

37. Chief Ranger Westphfal declared that the Superintendent was allowed "to suspend or revoke the permit of a motor vehicle for these violations, *regardless of court disposition / adjudication*." (Emphasis added).

38. The suspension notice further explained that "[i]f you receive another citation after the suspension is over, within the three-year time period beginning with your last citation, you will be subject to either a 60-day suspension or a permanent revocation at the discretion of the park."

39. The suspension notice ended by explaining Plaintiff had "14 days to plan accordingly before your permit privileges are temporarily suspended," and had "7 days to appeal the decision to the superintendent from the date on this letter with proper documentation and reasoning for your appeal."

40. Chief Ranger Westphfal did not specify which of Plaintiff's Essential Services Permits was being suspended. Indeed, the suspension notice did not even specify which of Plaintiff's vehicles were involved with the listed violation notices. As mentioned above, the authorizing regulation only permitted Superintendent Romero to suspend or revoke permits issued to motor vehicles involved in a violation. 36 C.F.R. § 7.20(a)(12)(ii). Plaintiff held three Essential Services Permits in 2020 when the violation notices were issued.

41. Plaintiff responded to the suspension notice by letter dated February 2, 2023, by requesting additional time to substantively respond because he did not get mail delivered daily and did not receive the January 27, 2023 suspension notice until January 30, 2023. He briefly

10

pointed out, among other issues, that the three notices of violations were all unadjudicated, dated back to September 2020, were issued during the height of the pandemic, and that permit conditions had not been routinely enforced for years.

42. Superintendent Romero deemed Plaintiff's request for additional time to respond as Plaintiff's appeal of his suspension, and by letter dated February 22, 2023, explained that "[i]n evaluating your appeal, I consulted with both the administration and law enforcement divisions at Fire Island National Seashore to review your permit and citations issued to you."

43. He explained that the dates of the notices of violation upon which Chief Ranger Westpfahl relied in the suspension notice were incorrect. Nevertheless, Superintendent Romero denied Plaintiff's appeal, and stated that Plaintiff's "Essential Services permit shall be suspended effective midnight February 24, 2023 running through 11:59pm on March 25, 2023," and that "[d]uring this time, your access fob will be deactivated."

44. Superintendent Romero did not address the fact that the violation notices were unadjudicated.

45. By letter dated March 9, 2023, Plaintiff appealed Superintendent Romero's decision to suspend his Essential Services Permit. Plaintiff explained that without his Essential Services Permits, he would be unable to remove trash from Kismet, Fire Island. Plaintiff also reserved his right to contest the violation notices.

46. Superintendent Romero wrote back the next day, March 10, 2023, stating, "I received your email letter yesterday regarding your appeal of my decision to suspend your Essential Service permit. My decision that was issued on February 22, 2023, to deny your appeal, stands."

### E. Predicate Violations for Superintendent Romero's 3-Strike Rule.

47. While the initial suspension notice was predicated on violation notices dated May 9, 2020, September 16, 2020, and September 28, 2020, the denial of Plaintiff's purported appeal was based upon violation notices dated June 5, 2020, September 8, 2020, and September 15, 2020, respectively numbered 951314, 9513179, and 9513180.

48. As to violation number 951314, dated June 5, 2020, Superintendent Romero explained in his February 22, 2022 denial of Plaintiff's purported appeal that "the Ranger observed your vehicle with New York license plate 69492JZ approaching the checkpoint gate. The Ranger recognized it as belonging to you. The Ranger engaged you in conversation telling you that you were driving an unpermitted vehicle."

49. Pursuant to the authorizing regulation, violation number 951314 is not a lawful predicate to suspend Plaintiff's Essential Services Permit, because the Superintendent's authority to suspend permits is limited to violations of "the permit of a motor vehicle involved in such a violation," and, by definition, driving a vehicle without a permit means there is not a permit associated with that vehicle which could be suspended. *See* 36 C.F.R. § 7.20(a)(12)(ii).

50. As to violation number 9513179, dated September 8, 2020, Superintendent Romero explained, "a Ranger performing a compliance check while reviewing video surveillance of the checkpoint gate, observed that on September 8, 2020, at approximately 6:15 p.m., a vehicle registered to [Plaintiff] with New York license plate 55879MK was engaged in carting of materials." The notice of violation itself simply states, "failure to comply with conditions of permit," as the factual basis for the charge.

51. Plaintiff's 2020 Essential Services Permit for the vehicle bearing New York license plate 55879MK was permit number 515. Plaintiff did not have an Essential Services

12

Permit for this vehicle in 2021 or 2022. Instead, Plaintiff had Construction Permits for this vehicle in 2021 and 2022, respectively permit numbers 426 and 424.

52. As to violation number 9513180, dated September 15, 2020, Superintendent Romero explained, "a Ranger performing a compliance check while reviewing video surveillance of the checkpoint gate, observed that on September 15, 2020 at approximately 6:30 a.m., a vehicle registered to you with New York license plate 72452JU was engaged in carting of materials." This notice of violation also states, "failure to comply with conditions of permit," as the factual basis for the charge.

53. Plaintiff's 2020 Essential Services Permit for the vehicle bearing New York license plate 72452JU was permit number 514. Plaintiff's 2021 Essential Services Permit for this vehicle was permit number 475, and his 2022 Essential Services Permit for this vehicle was permit number 510.

54. Plaintiff also had a 2020 Essential Services Permit for a vehicle bearing New York license plate number 23031MJ, which was permit number 516. Plaintiff's 2021 Essential Services Permit for this vehicle was permit number 477, and his 2022 Essential Services Permit for this vehicle was permit number 512.

55. Violation notices 9513179 and 9513180 were both issued by Officer Nicks, Officer No. 2585, after he allegedly performed a review of surveillance video. Notably, the violation notices were numbered consecutively, although the alleged dates of incident were one week apart.

56. Plaintiff was not personally served with either violation notice 9513179 or violation notice 9513180. Instead, he received them by mail, together with undated cover letters signed by Jon Swindle, Supervisory Ranger, for each purported violation. Each cover letter

informed Plaintiff that "[t]his violation notice has been forwarded to the Central Violations Bureau and you will be notified of your court date in the mail."

57. Plaintiff was not required to appear in this Court in relation to the violation notices until February 21, 2023—after having already received the January 27, 2023 suspension notice.

58. The nearly 2 ½ year delay in prosecuting the violation notices that Plaintiff was charged with in 2020 is a violation of Plaintiff's due process rights and Sixth Amendment right to a speedy trial and would warrant dismissal of those violation notices. It must then follow that to use those unadjudicated violation notices as the predicate for suspending Plaintiff's Essential Services Permit nearly 2 ½ years after the dates of incident is also violation of Plaintiff's due process rights.

### FIRST CAUSE OF ACTION
### (Violation of the APA)

59. Plaintiff incorporates the allegations asserted in the prior paragraphs as if stated fully herein.

60. The Administrative Procedure Act, 5 U.S.C. §§ 701-706 (the "APA"), authorizes courts to review final agency actions and hold unlawful and set aside final agency actions, findings, and conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The APA provides a cause of action to challenge any final agency action taken pursuant to any statute where the action is made reviewable by that statute, or where there is no other adequate remedy in a court. 5 U.S.C. § 704.

61. Defendants' February 22, 2023 and/or March 10, 2023 decision to suspend Plaintiff's Essential Services Permit and deny Plaintiff's appeal is a final agency action for which there is no other available remedy in a court other than review under the APA.

62. Defendants' February 22, 2023 and/or March 10, 2023 decision to suspend Plaintiff's Essential Services Permit and deny Plaintiff's appeal was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

63. Defendants suspended Plaintiff's Essential Services Permit purportedly pursuant to Superintendent Romero's 3-Strike Rule as set forth in his letter dated April 14, 2021. In doing so, Defendants disregarded the authorizing regulation, 36 C.F.R. § 7.20, and disregarded Plaintiff's due process rights.

64. First, the violation notices used as the predicate to suspend Plaintiff's Essential Services were unadjudicated. Despite the January 27, 2023 suspension notice claiming that Superintendent Romero was authorized to suspend Plaintiff's permit despite the predicate violation notices being unadjudicated, the authorizing regulation requires a conviction.

65. Specifically, Superintendent Romero is authorized only to suspend or revoke a permit "[i]n addition to any penalty required by § 1.3(a)," which, in turn, states that "[a] person *convicted* of violating a provision of the regulations… shall be subject to the criminal penalties provided under 18 U.S.C. 1865." *See* 36 C.F.R. §§ 7.20(a)(12)(ii) and 1.3(a) (emphasis added). Therefore, because Plaintiff could not be penalized under Section 1.3(a) until he was convicted, Superintendent Romero could not suspend or revoke Plaintiff's permit "in addition to" the penalties under Section 1.3(a) without a conviction.

66. Second, in addition to the fact that the violation notices were unadjudicated when Plaintiff's Essential Services Permit was suspended, those violation notices were likely subject to dismissal under the Fifth Amendment's due process rights and the Sixth Amendment's right to a speedy trial. Thus, using the stale violation notices as the predicate to suspend Plaintiff's

Essential Services Permit 2 ½ years after receiving the violation notices would violate Plaintiff's due process rights.

67. Third, even if Plaintiff had been found guilty of the violation notices, Superintendent Romero was only authorized to suspend or revoke "the permit of a motor vehicle involved in such a violation." 36 C.F.R. § 7.20(a)(12)(ii). Thus, because violation number 915314 involved a vehicle without a permit, it could not be the predicate violation to suspend any of Plaintiff's Essential Services Permit. Violation notices 9513179 and 9513180, on the other hand, could only be the predicate violations to suspend the permits issued to those vehicles, which were 2020 Essential Services Permit numbers 515 and 514, respectively. Notably, however, these permits were invalid by the next year and Plaintiff had obtained new permits for these vehicles.

68. Fourth, enforcement of permit conditions was historically inconsistent and remained inconsistent even after Superintendent Romero instituted the 3-Strike Rule. Chief Ranger Westphal's suspension notice even acknowledged that Plaintiff should have received a notice of suspension in 2020 after his third violation notice, but he did not receive the notice until 2023.

69. Indeed, despite issuing the original 3-Strike Rule in 2019, effective 2020, Superintendent Romero did not suspend or revoke any permits until some point in 2022, and by April 2023, had only suspended or revoked three permits, one of which was Plaintiff's.

70. Fifth, Superintendent Romero's original 3-Strike Rule purported to authorize Superintendent Romero to revoke a permit "depending on the severity of the offense and/or after 3 violations of permit conditions within a 3-year span." The updated 3-Strike Rule "introduce[d] the possibility of suspension of driving privileges as well as revocation of the driving permit. The

16

Park will review the history, nature, and severity of the offenses, and issue a decision via memorandum to the permit holder."

71. As noted above, only two of the three violations referenced in Superintendent Romero's denial of Plaintiff's appeal involved permits issued to the motor vehicle involved in the violations. Thus, even by the original, more draconian, 3-Strike Rule, Superintendent Romero would be required to analyze the severity of the violation notices. Pursuant to the updated 3-Strike Rule, he was required to review the history, nature, and severity of the offenses. He utterly failed to do so.

72. As Plaintiff explained in his February 2, 2022, request for an extension of time to respond to the suspension notice, the violation notices were issued during the height of the COVID-19 pandemic, and at least one of the violation notices concerned Plaintiff carting groceries for his family. The severity of the offense of bringing groceries to his family during a global pandemic did not warrant a suspension. Moreover, on the date of incident of that violation notice, Plaintiff was authorized by his year-long resident permit to drive to the grocery store and return with groceries. Thus, Plaintiff was simply reducing the amount of overall motor vehicle travel that would otherwise occur. This is precisely within the spirit of the authorizing regulation. *See, e.g.*, 36 C.F.R. § 7.20(a)(7)(iii) ("Any motor vehicle… must, prior to the issuance of such permit:… (iii) Have a rated gross vehicle weight not in excess of 10,000 pounds, *unless the use of a larger vehicle will result in a reduction of overall motor vehicle travel*.") (emphasis added).

73. On information and belief, Superintendent Romero, rather than applying the 3-Strike Rule fairly and lawfully, used it to target Plaintiff for his support of former Chief Ranger Stewart.

4877-5934-3474.4

74. For the foregoing reasons, the suspension of Plaintiff's Essential Services Permit constitutes an agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Additionally, because Superintendent Romero did not have authority under 36 C.F.R. § 7.20 to suspend Plaintiff's Essential Services Permit, the suspension was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of procedure required by law," within the meaning of the APA. 5 U.S.C. § 706(2).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court issue an Order:

(a) Declaring that Defendants acted in a manner that was arbitrary, capricious an abuse of discretion and in violation of 36 C.F.R. § 7.20;

(b) Vacating and setting aside the suspension of Plaintiff's Essential Services Permit;

(c) Awarding Plaintiff's attorney fees' and costs as may be permitted by law; and

(d) Granting such other and further relief as may be just and proper.

Dated: Melville, New York
August 18, 2023

**NIXON PEABODY LLP**

By: */S/Timothy D. Sini*
Timothy D. Sini
Neil P. Diskin
275 Broadhollow Road
Melville, New York 11747
(516) 832-7500
tsini@nixonpeabody.com
ndiskin@nixonpeabody.com